UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION AT TOLEDO

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SPRINGFIELD DAIRY, LLC, | ) | Case No. 10-35426 |
| | ) | |
| Debtor. | ) | Hon. Mary Ann Whipple |

**AFFIDAVIT OF ALM de KLEIJNE IN SUPPORT OF FIRST DAY MOTIONS**

I, ALM de Kleijne ("Arno"), affirm under penalties of perjury the following:

1. I am the sole member of De Kleijne Dairy, LLC, who is, in turn the sole member of Springfield Dairy, LLC ("Dairy"), the debtor and debtor-in-possession in the above captioned case ("Chapter 11 Case"). I submit this affidavit ("de Kleijne Affidavit") in support of the various first day motions ("First Day Motions") filed concurrently herewith.

2. I have reviewed the First Day Motions (including the exhibits thereto) and I believe the relief sought in each (a) is vital to enable Dairy to make the transition to, and operate in, Chapter 11 with a minimum of interruption or disruption to the business or loss of productivity and (b) constitutes a critical element in achieving Dairy's successful reorganization. Any capitalized terms not expressly defined herein shall have the meaning ascribed to that term in the relevant First Day Motion.

3. Except as otherwise indicated, all facts set forth in this Affidavit are based upon my personal knowledge, my review of relevant documents, my opinion, my experience and knowledge of Dairy's operations and financial condition, or are based upon the experience and knowledge of Dairy's employees, as reported to me. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized on behalf of Dairy to submit this Affidavit.

## DAIRY BACKGROUND AND EVENTS LEADING TO CHAPTER 11 CASE

4. Dairy is a member managed limited liability company that operates a commercial family dairy operation located at 17495 County Road C, Bryan, Ohio 43506 and began business operations in 2005. The sole member of Dairy is De Kleijne Dairy, LLC ("De Kleijne Dairy"). I am the sole member of De Kleijne Dairy.

5. Dairy has a current capacity of approximately 2,000 stalls and is milking about 1,700 cows on a daily basis. Dairy had accrual profits of $534,420 in 2007 and $489,004 in 2008. In 2009, due to events described below in the dairy industry, Dairy suffered a net loss of $580,000, but that loss includes $1.5 million of depreciation costs. In June 2010, Dairy posted an operating profit of $6,049 (inclusive of about $124,000 of depreciation costs). Dairy's primary source of income comes from the sale of milk to Dairy Farmers of America, Inc. ("DFA"). Dairy receives weekly estimated payments on its milk sales from DFA and a final reconciliation payment from DFA on or about the 15th of each month for milk sold during the immediately preceding month.

6. Dairy employs 20 employees, with an average annual payroll of approximately $440,000. Dairy is a valuable contributor to the local economy of Williams County, purchasing feed, supplies and services locally to support its operations. Those local dollar expenditures average about $4 million annually.

7. In 2004 De Kleijne Dairy bought 80 acres and commercial dairy facilities (the "Original Facility Property") from the owner of Prairie Creek Dairy, LLC. At that time the Original Facility Property supported a 600 cow operation. In 2005, as part of expanding the Original Facility Property to milk 2,000 cows, De Kleijne Dairy transferred the real property underlying the Original Facility Property to Springfield Dairy Leasing, LLC ("Leasing") who

- 2 -

BDDB01 6141420v5

10-35426-maw    Doc 13    FILED 08/09/10    ENTERED 08/09/10 17:36:35    Page 2 of 14

then leased it back to Dairy on a triple net lease. Leasing's sole member is Midwest Dairy Investments, LLC ("Midwest"), a subsidiary of Vreba-Hoff Dairy Development, LLC ("Development"). Leasing and Midwest financed through AgStar Financial Services, FLCA ("AgStar FLCA") the expansion of Dairy's operations and granted a mortgage and security interest in the real property and expanded improvements and equipment ("Dairy Property") to AgStar FLCA. The lease payments made by Dairy to Leasing supported the mortgage payments owed to AgStar FLCA by Leasing. As part of the expansion, Dairy entered into loans ("PCA Loans") with AgStar Financial Services, PCA ("AgStar PCA") to purchase cattle, feed, and equipment for the expanded facilities. Leasing transferred title to the Dairy Real Property and all equipment used by Dairy to Dairy prior to the filing of the Chapter 11 petition in consideration of Dairy's assumption of Leasing's obligations to AgStar FLCA under the mortgage and related loan.[1]

8. Beginning in or around Spring, 2009, dairies across the country were hit hard as market prices for milk fell dramatically to lows of less than $10 per hundred weight ("CWT") from highs of up to $24 per CWT in the prior years. The dramatic decline in the prices a buyer was willing to pay for milk substantially decreased Dairy's revenues at the same time that fixed costs for feed and other supplies went up. In 2009, AgStar PCA determined not to renew the PCA Loans though Dairy continued to make interest payments, some of which were

---

[1] On November 25, 2009, AgStar filed a Complaint ("Complaint") for breach of contract, foreclosure, replevin and other relief in the District Court for the Northern District of Ohio, Western Division, against Leasing, naming Dairy for its interests in the property subject to the foreclosure. DeLaval, Inc. and Fifth Third Bank, N.A., also named to assert interests in the property, have answered and asserted their interests.

- 3 -

BDDB01 6141420v5

10-35426-maw    Doc 13    FILED 08/09/10    ENTERED 08/09/10 17:36:35    Page 3 of 14

accepted. The outstanding balance under the PCA Loans is approximately $3.1 million. Leasing defaulted on its loans with AgStar FLCA.

9. With the steep loss in revenue, Dairy's decreased profits made it difficult to operate the dairy at capacity. Dairy did not have the funds to maintain its customary herd turnover, and the herd declined from a peak of 1,900 milking cows to a low of 1,700 milking cows as of the Petition Date. The reduction in milking cows reduced the income from operations, however, with the exception of one feed vendor, Dairy remained mostly current with its trade creditors and is current on all taxes.

10. In response to the declining milk prices and decreased profit margins, Dairy has eliminated unnecessary costs and reworked unprofitable contracts. Through these efforts, Dairy has dramatically reduced the minimum production needed for a "break even" operation. Milk prices have started to rebound and Dairy forecasts stabilizing revenue and a return to profitability and the ability to pay its debts.

11. Dairy has filed this Chapter 11 Case to restructure the debt on its operations and properties and continue in business providing economic development to rural Ohio.

**FIRST DAY MOTIONS**

A.  *First Day Cash Collateral Motion*

12. I have reviewed the First Day Cash Collateral Motion ("Cash Collateral Motion") and believe the relief requested therein is necessary to the continued operation of Dairy's business operations. The Cash Collateral Motion, as I understand it, seeks the entry of an interim and a final order authorizing the use of cash and cash equivalents in which AgStar PCA asserts a security interest.

- 4 -
BDDB01 6141420v5

10-35426-maw    Doc 13    FILED 08/09/10    ENTERED 08/09/10 17:36:35    Page 4 of 14

13. Dairy's counsel informs me that cash and cash equivalents received by Dairy from and after the Petition Date as proceeds of AgStar PCA's asserted prepetition collateral interest including funds from milk and milking operations may constitute cash collateral of AgStar PCA ("Cash Collateral") within the meaning of section 363(a) of the Bankruptcy Code. To the extent that is found to be valid by this Court and in order for Dairy to operate its business in a normal fashion and preserve the bankruptcy estate, it is critical that Dairy have immediate authorization to use cash pursuant to the terms and conditions of the Interim Order.

14. In addition to allowing Dairy's business to continue on a normal basis, authorizing the use of Cash Collateral will enable Dairy to (i) best utilize its existing and available financial resources, (ii) engender confidence in vendors and allow Dairy to purchase goods and services on normal trade terms, and (iii) fund payments that will be required pursuant to other orders of this Court.

15. Dairy's use of the Cash Collateral as requested herein will not result in any diminution in the Bank's position during the Interim Cash Collateral Period. As the Cash Use Budget indicates, Dairy had about $38,000 in its bank accounts on the Petition Date and projects that week to week it will maintain a positive balance of cash such that AgStar PCA will be adequately protected in Dairy's use of the Cash Collateral. Moreover, Dairy will grant to AgStar PCA replacement liens in its assets that are similar to the assets AgStar PCA asserts a prepetition security interest in to the extent of the diminution in value of AgStar PCA's Cash Collateral.

16. Dairy is generally current with its vendors, owes no past due taxes and will be able to adequately protect AgStar PCA and AgStar FLCA during the course of the Chapter 11 Case from the cash generated by its operations.

BDDB01 6141420v5

17. Dairy has immediate need to use its cash to pay the ordinary and reasonable expenses of operating its business, including, without limitation, payroll and benefit expenses, utility services, payroll taxes, insurance, supplies and equipment, vendor and supplier services, and other expenditures as are necessary for operating Dairy's business. In addition, such cash would be necessary to fund other payments approved by Court order, including for payment of professional and other administrative expenses.

18. I believe the terms and conditions of the Interim Order are fair and reasonable under the circumstances and reflect Dairy's exercise of reasonable business judgment consistent with Dairy's fiduciary duties as debtor in possession.

19. Without the relief granted in the Interim Order, Dairy may be forced to suspend or curtail its normal operations. Because the use of cash by Dairy is necessary to prevent the harm that would befall Dairy, its estate, its creditors and employees if Dairy's business had to cease operations, the Court should authorize Dairy's use of cash and enter the Interim Order as attached to the Cash Collateral Motion.

B. *Motion to Pay Prepetition Wages and Other Obligations to Employees*

20. I have reviewed Dairy's First Day Motion to Pay Prepetition Wages and Other Obligations to Employees ("<u>Employee Obligations Motion</u>"). As of the Petition Date, Dairy employs 20 employees.

21. Based upon my review of the Employee Obligations Motion, it is my understanding that Dairy is requesting the Court to enter an order authorizing, but not directing, Dairy to pay or otherwise honor prepetition wages, salaries and other prepetition obligations (collectively, "<u>Employee Obligations</u>"), owing to Dairy's employees (collectively, "<u>Employees</u>").

BDDB01 6141420v5

22. Dairy is also seeking the entry of an order directing all banks and other financial institutions to honor Dairy's prepetition checks for payment of the Employee Obligations and prohibiting banks from placing any holds on, or attempting to reverse, any automatic transfers to Employees' accounts for Employee Obligations.

23. I believe that the relief requested in the Employee Obligations Motion is necessary because the Employees are vital to the continued operation of Dairy's business, the health of the livestock, and to a successful reorganization. In order to retain the Employees and maintain morale, I believe that Dairy must have authority to pay or otherwise satisfy the Employee Obligations. The amounts to be paid to Employees pursuant to the Employee Obligations Motion are reasonable compared with the importance and necessity of the Employees and the losses Dairy will likely suffer if these amounts are not paid. None of the requested amounts to be paid per individual employee total more than the priority amount provided to these types of claims under Section 507(a)(4) and (5) of the Bankruptcy Code.

24. Accordingly, I believe that Dairy should be authorized to pay the Employee Obligations in the ordinary course of business.

C. *Motion to Provide Adequate Assurance to Utilities*

25. I have reviewed the First Day Motion For Order (A) Deeming Utilities Adequately Assured of Future Performance, And (B) Establishing Procedure for Determining Adequate Assurances ("Utilities Motion"). I believe that the relief requested is in the best interests of all parties in interest and will similarly benefit all parties in interest in the Chapter 11 Case.

26. In connection with the operation of its business, Dairy purchases electricity, natural gas, water, telephone and communications services and/or similar services

through various utility companies (collectively, "Utility Companies").  Based upon my review of the Utilities Motion, it is my understanding that Dairy is requesting that this Court enter an order enjoining the Utility Companies from altering, refusing, or discontinuing services to, and/or discriminating against, Dairy on the basis of the commencement of the Chapter 11 Case or on account of any unpaid invoice for service provided by any of the Utility Companies to Dairy prior to the Petition Date.

27. Dairy is also requesting that this Court determine that the Utility Companies be deemed to be adequately assured of future payment by the holding of the current deposits and the nature of Dairy's accounts with the Utility Companies.

28. Furthermore, Dairy is requesting certain procedures be put in place regarding any Utility Company seeking additional assurance from Dairy.  The procedures detailed in the Utilities Motion are efficient, cost effective, fair and reasonable under the circumstances.

29. To the best of my knowledge, information, and belief, Dairy is not currently in default on any prepetition payments owed to any of the Utility Companies.  I believe that Dairy's record of generally timely payment in full of prepetition invoices to the Utility Companies and sufficient funds from postpetition business operations adequately assures Dairy's continued payment for utility services provided by the Utility Companies without the need for deposits or other security from Dairy.  Moreover, the Utility Companies are provided further assurance of future payment by virtue of their potential entitlement to administrative expense priority treatment for the provision of any actual and necessary services to Dairy's estate on a postpetition basis.  The procedure outlined in the Utilities Motion provides a fair means for any Utility Company to seek relief without endangering the health or welfare of the cattle.

D.  *First Day Motion to Pay Certain Sales, Use and Other Taxes to Taxing Authorities*

30. I have reviewed the First Day Motion to Pay Certain Sales, Use and Other Taxes to Taxing Authorities ("Tax Motion").  Based upon my review of the Tax Motion, I understand that Dairy is seeking an order from the Court authorizing, but not directing, it to pay prepetition sales, use, payroll, trust fund, real estate and other taxes and similar obligations to the respective authorities in the ordinary course of Dairy's business.  Nothing contained in the Tax Motion, however, would preclude Dairy from contesting, the validity and amount of any taxes under bankruptcy or nonbankruptcy law.

31. In connection with the normal operation of its business, Dairy (i) incurs property taxes; (ii) collects sales and incurs use taxes; and (iii) collects or incurs payroll and employment-related taxes on behalf of various taxing authorities (each, a "Tax", and collectively, "Taxes").  The Taxes are paid to various taxing authorities (collectively, "Authorities") on a periodic basis (e.g., monthly, quarterly or yearly) that is established for each particular Tax.  On the Petition Date, certain Taxes were incurred or collected by Dairy but were not yet paid to the applicable Authority.

32. While reserving the right to argue to the contrary in particular cases, I am informed that Dairy generally does not have any legal or equitable interest in funds held to pay Taxes.  Moreover, to the extent that Taxes are "trust fund" taxes and other amounts are collected from third parties and held for payment to the Authorities, I am informed that they are not property of the chapter 11 estate.  Dairy, therefore, generally has no equitable interest in funds collected and segregated to pay Taxes.

33. Dairy believes that some, if not all, of the Authorities may, pursuant to § 362(b)(9) of the Bankruptcy Code, cause Dairy to be audited and subjected to various

administrative proceedings if the Taxes are not paid immediately. Such audits and administrative proceedings and the accompanying disruption in business activities would materially and adversely affect Dairy's reorganization prospects and unnecessarily divert Dairy's attention away from the successful launch and prosecution of the Chapter 11 Case.

34. Further, I am informed that most, if not all, of the Taxes, are entitled to priority status under the Bankruptcy Code. Dairy's payment of the Taxes in the ordinary course of business, in all likelihood, will only affect the timing of the payments and not the amounts to be received by such entities. Therefore, I do not believe that other creditors and parties in interest will be prejudiced by such payment.

35. I believe that granting the relief requested will enhance the likelihood of the successful reorganization of Dairy and the probability of maximizing the value of estate assets and, ultimately, the return to creditors. Further, I believe that the timely payment of the Taxes is necessary and in the best interest of Dairy's estate. Accordingly, Dairy is seeking authority to pay, in its sole discretion, the Taxes to the relevant Authorities in the ordinary course of business.

E. *First Day Motion For Order Authorizing Maintenance of Existing Bank Accounts and Continued Use of Existing Business Forms*

36. I have reviewed the First Day Motion For Order Authorizing Maintenance Of Existing Bank Accounts And Continued Use Of Existing Business Forms ("Cash Management Motion"). Based upon my review of the Cash Management Motion, I understand that Dairy is seeking authorization for the continued maintenance of the PNC Account (as an approved depository), and continued use of its existing business forms. I believe that these requests are in the best interests of Dairy, its estate and all parties in interest.

37. It is my understanding that the Office of the United States Trustee has established certain operating guidelines for debtors-in- possession in order to supervise the administration of chapter 11 cases and that those guidelines require chapter 11 debtors to, among other things: (a) close all existing bank accounts and open new debtor-in-possession bank accounts; (b) establish one debtor-in-possession account for all estate monies required for the payment of taxes, including payroll taxes; (c) maintain a separate debtor-in-possession account for cash collateral; and (d) obtain checks for all debtor-in-possession accounts that bear the designation "Debtor-In-Possession," the bankruptcy case number and the type of account.

38. In order to avoid delays in payments to administrative creditors, to ensure as smooth a transition into chapter 11 as possible, and to aid in Dairy's efforts to reorganize, I believe that it is important that Dairy be permitted to continue to (i) maintain the PNC Account in the ordinary course of business, and (ii) pay any ordinary course postpetition bank fees that may be incurred in connection with the PNC Account.

39. In sum, subject to a prohibition against honoring prepetition checks without specific authorization from this Court, I believe it is vitally important that the PNC Account be deemed a debtor-in-possession account and that the maintenance and continued use be in the same manner and with the same account number, style, and document forms as those employed during the prepetition period. If the relief requested in the Cash Management Motion is granted, Dairy will not pay, and PNC Bank will be directed not to pay, any debts incurred before the Petition Date other than as authorized by the Court.

40. In order to minimize expenses to the estate, Dairy also is requesting authority to continue to use all correspondence, business forms, including, but not limited to, letterheads, envelopes, promotional materials, invoices, order forms and checks existing

immediately prior to the Petition Date without reference to Dairy's status as debtor-in-possession. Dairy's creditors are primarily local and will be aware of Dairy's status as debtor-in-possession. Moreover, each of Dairy's vendors will receive direct notice of the commencement of the Chapter 11 Case. Further, I believe that changing correspondence and business forms would be expensive, unnecessary and burdensome to Dairy's estate and disruptive to Dairy's business operation and would not confer any benefit upon those dealing with Dairy. Therefore, I believe that Dairy should be authorized to use existing checks and business forms without being required to place the label "debtor in possession" on each.

41. In sum, it is essential that Dairy be authorized to continue the maintenance of the PNC Account and continue the use of existing business forms. I believe that these requests are in the best interest of Dairy, its estates and all parties in interest.

F. *Motion to Extend Deadline for Filing Debtor's Statement and Schedule Pursuant to §§ 105(a), 521, and Fed. R. Bankr. P. 1007(c)*

42. I have reviewed the Motion to Extend Deadline for Filing Debtor's Statement and Schedule Pursuant to §§ 105(a), 521 and Fed. R. Bankr. R. 1007(c) ("<u>Schedule Extension Motion</u>"). Based upon my review of the Schedule Extension Motion, I understand that Dairy is seeking entry of an order extending the date by which Dairy must file its Statement of Financial Affairs and Schedule of Assets and Liabilities (collectively, "<u>Statement and Schedule</u>"). I believe that this request is in the best interests of Dairy, its estate and all parties in interest.

43. I believe that the early days of the Chapter 11 Case may consume all of my time as I am new to this process and will need time to understand the new reporting and other requirements which Dairy will be required to fulfill.

44. Running a dairy farm is a twenty-four hour a day job, and I do not believe that fifteen days is enough time to allow me to accurately and fully complete the Schedule and Statement.

Pursuant to 26 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on August 9, 2010 at Bryan, Ohio.

SPRINGFIELD DAIRY, LLC

By: De Kleijne Dairy, LLC

By: /s/ Wim de Kleijne
Printed: ALM de Kleijne
Title: Sole Member of De Kleijne Dairy, LLC

- 13 -

## CERTIFICATE OF SERVICE

      The undersigned hereby certifies that a copy of the foregoing was served on the Initial Notice Parties via expedited delivery (Federal Express, United States Express Mail, facsimile transmission, or electronic mail transmission) on August 9, 2010.

                                                    /s/ John R. Burns